

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00090-CR

_____

LARRY THOMAS CHAMBERS, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 277th District Court
Williamson County, Texas
Trial Court No. 17-068-K277

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

Larry Thomas Chambers, Jr., appeals his conviction by a Williamson County[1] jury of possession of four or more, but less than 200, grams of a penalty group 1 controlled substance and resulting twenty-year sentence.[2]  Upon review of the evidence and applicable law, we find that (1) there is sufficient evidence that Chambers intentionally or knowingly possessed methamphetamine in an amount of more than four grams, but less than 200 grams, as alleged in the indictment, (2) the trial court did not err in denying Chambers' motion to suppress, (3) the trial court did not err in refusing to include an Article 38.23 jury instruction in the court's charge, and (4) the sentence imposed by the jury did not violate the United States Constitution's Eighth Amendment.  Accordingly, we affirm the trial court's judgment.

## I.    Evidence Presented at Trial

At approximately 10:45 p.m. on April 1, 2017, Round Rock Police Sergeant Sam Connell observed a pick-up truck operating on the highway frontage road that did not appear to have a rear license plate as required by law.[3]  Connell activated his overhead lights to initiate a traffic stop, but the vehicle did not immediately pull over.  Rather, the driver—later determined to be Chambers—continued driving for approximately one-quarter of a mile before he finally stopped.

---

[1]Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013).  We are unaware of any conflict between precedent of the Third Court of Appeals and that of this Court on any relevant issue.  *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(d) (West 2017).

[3]*See* TEX. TRANSP. CODE ANN. § 504.943 (West 2018), § 547.322 (West 2011).

2

At one point while he was following Chambers' vehicle, Connell observed Chambers place his left hand outside of the driver's side window. At that point, Connell activated his air horn siren, but Chambers still did not pull over.[4] Finally, after passing other parking lots and businesses Chambers pulled into a restaurant parking lot. Connell testified that he considered Chambers' failure to timely stop to be unusual.

After he stopped, Chambers immediately began exiting the vehicle. Connell testified that this action seemed unusual to him as well. Because Chambers had already failed to respond to Connell's lights and siren, the officer believed "there was possibly something -- something not right about the traffic stop." Connell became concerned for his safety.

By the time Chambers pulled over, another officer had arrived at the scene. The officers unholstered their side-arms and ordered Chambers to stay in the vehicle and put his hands on the steering wheel. Chambers complied, but then briefly lowered his right hand out of view. It was later discovered that a loaded pistol, with the hammer cocked, was laying in the seat in the area where Chambers had moved his hand. Two more officers arrived at the scene shortly thereafter.

One of the officers, Ryan Wilson, found several "shards" of a substance in Chambers' pockets while he was checking him for weapons. A field test indicated that the substance was likely to be methamphetamine. Another officer, Lauren Weaver, saw a pistol butt and a small baggy of what she suspected to be narcotics inside Chambers' truck.

---

[4]Connell activated his dash-cam before he activated his overhead lights. The overhead lights were activated twenty-seven seconds before Connell sounded his siren. Chambers continued on the access road another fifty seconds before finally pulling into a restaurant's parking lot.

After Chambers was removed from the vehicle, Sergeant Jeff Koop heard a crunching sound under his feet and looked down. When he did, he found another baggy containing a substance that appeared to be narcotics on the ground immediately outside the driver's side door of Chambers' vehicle. A second loaded pistol was found under the driver's seat.

Chambers was arrested and subsequently indicted for possession of four grams or more, but less than 200 grams, of a penalty group 1 controlled substance. At trial, a chemist for the Texas Department of Public Safety's Austin crime laboratory testified that the substances submitted from Chambers' arrest proved to contain methamphetamine and that the aggregate weight of all of the substances was 5.42 grams. The jury found Chambers guilty of the offense charged in the indictment. At the sentencing phase of trial, the jury imposed a sentence of twenty years' imprisonment. Chambers appeals the judgment and sentence.

## II.    Sufficient Evidence to Prove Chambers' Intent

In his first point of error, Chambers argues that the evidence was insufficient to prove he intentionally or knowingly possessed methamphetamine as charged in the indictment. Specifically, he argues that there is insufficient evidence to prove that the baggy of narcotics found by Koop was in his possession. In the absence of evidence establishing his possession of the substance, Chambers argues that the State failed to prove that the aggregate weight of any substance in his possession was more than four grams, as charged in the indictment. We find the evidence sufficient to support the jury's finding.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential

4

elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In determining whether the evidence is sufficient to establish a defendant's possession of illegal drugs, we consider the following non-exclusive list of factors:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006). "It is . . . not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial." *Id.* at 162. "Possession" is defined as "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp. 2018).

5

The record demonstrates several circumstances linking Chambers to the drugs which led to his conviction. To begin with, Chambers was present when the drugs were found. He was also the only occupant of the truck. The baggie of drugs found by Koop was in Chambers' proximity. At least two baggies of other drugs were in plain view, in Chambers' proximity, and accessible by him. Chambers consented to the search of his person, and pieces of methamphetamine were also found in his pockets. While Chambers did not flee, he did not immediately yield to Connell's attempt to conduct a traffic stop either.

Moreover, Chambers made furtive gestures. Connell previously observed Chambers holding his hand outside his window before he finally pulled over. Chambers also moved his hand down and out of Connell's view at one point during the stop. One of the pistols was found in the area where he lowered his hand. While ownership of the truck was never established, the drugs were found in the vehicle, in Chambers' pocket, and within a foot of the vehicle outside Chambers' open driver's door. Chambers' failure to immediately pull to the roadside upon law enforcement's commands (at one point holding his hand outside of the driver's side window) may be construed as consciousness of guilt.[5] There was no evidence that large sums of cash or drug paraphernalia were found at the scene of the traffic stop.

The logical force of the evidence allowed a rational fact-finder to conclude that Chambers intentionally or knowingly possessed the methamphetamine in question. "[I]ntent may be inferred

---

[5]"Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn." *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989).

6

from the acts and conduct of a defendant." *Cooper v. State*, 67 S.W.3d 221, 225 (Tex. Crim. App. 2002) (Keasler, J., concurring). We overrule the first point of error.

## III. The Trial Court Did Not Err in Denying Chambers' Motion to Suppress Evidence

In his second point of error, Chambers argues that the trial court erred in denying his motion to suppress evidence. Chambers argues that the State never established facts to support Connell's reasonable suspicion for stopping him. Specifically, he argues that the State never proved that the vehicle had no license plate. He argues that Connell was not a credible witness because a paper license plate can clearly be seen in the dash-cam footage from Connell's vehicle.

"Police officers may stop and detain a person if they have a reasonable suspicion that a traffic violation is in progress or has been committed." *Young v. State*, 420 S.W.3d 139, 142 (Tex. App.—Texarkana 2012, no pet.) (citing *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992)). "A traffic stop is a detention and must be reasonable under the United States and Texas Constitutions." *Id.* (citing *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997)).

The standard of review for the "trial court's ruling on a motion to suppress is abuse of discretion." *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). "We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review." *Myrick v. State*, 412 S.W.3d 60, 63 (Tex. App.—Texarkana 2013, no pet.) "[A]s a general rule, the appellate courts . . . should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact[-]findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We "'afford the same amount of deference to trial courts' rulings on 'application of

7

law to fact questions,'[6] also known as 'mixed questions of law and fact,'[7] if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id*. We review de novo trial court decisions applying applicable laws. *See Caramouche v. State*, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000).

We disagree with Chambers' contention that the dash-cam video from Connell's police cruiser clearly shows the paper license tag on the left side of Chambers' bumper. We have reviewed the video, and the glare in the video is so great that the video does not definitively depict the vehicle's license plate. The question then becomes whether, considered in the light most favorable to the trial court's ruling, Connell had a reasonable suspicion a traffic violation had occurred.

"If an officer has a *reasonable basis* for suspecting that a person has committed a traffic offense, the officer may legally initiate a traffic stop. The officer also may detain a person who commits a traffic violation." *Zervos v. State*, 15 S.W.3d 146, 151 (Tex. App.—Texarkana 2000, pet. ref'd) (citing *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992)). Failure to properly display a license plate on a vehicle is a traffic violation and can constitute reasonable suspicion for an officer to make a traffic stop. *See Kennedy v. State*, 847 S.W.2d 635, 636 (Tex. App.—Tyler 1993, no pet.) (traffic stop was reasonable where officers could not read a faded dealer tag in the back window of a vehicle and suspected the tag to be expired); *Pabst v. State*, 466

---

[6]*Villareal v. State*, 935 S.W.2d 134, 141 (Tex. Crim. App. 1996) (Clinton, J., concurring).

[7]*Id*. at 139 (McCormick, P.J., concurring).

8

S.W.3d 902, 906 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (traffic stop was reasonable where officer could not read temporary license tag from a few feet away).

Moreover, even if the officer's reasonable suspicion turns out to be unfounded, this does not obviate the reasonableness of the initial traffic stop. For example, in *Foster v. State*, the Beaumont Court of Appeals held that officers had reasonable suspicion to stop a driver based on their belief that he had failed to display a license plate on his vehicle. *Foster v. State*, 814 S.W.2d 874, 878 (Tex. App.—Beaumont 1991, pet. ref'd), *abrogated on other grounds by Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991). Even though it was later determined that the license plate was displayed in the vehicle's rear window, the court held that the traffic stop was still reasonable because the vehicle's windows were tinted, and the plate was not initially visible. *Id*. Here, Connell testified that he could not see any rear license plate or tag on Chambers' truck, and the dash-cam recording does not clearly refute his testimony. Accordingly, the record supports the trial court's finding that Connell had a reasonable suspicion Chambers had violated a traffic law and that Connell was justified in conducting the traffic stop.

Chambers also argues that the trial court erred in denying the motion to suppress because Chambers was arrested without a warrant. Chambers argues that, because Connell and the first back-up officer on scene ordered Chambers out of the vehicle with their side-arms drawn, Chambers was effectively arrested immediately after he pulled over in the parking lot. This argument ignores Chambers' preceding conduct as described by Connell.

At the suppression hearing, Connell testified that Chambers failed to pull over immediately, continued to drive about one-quarter mile after Connell activated his overhead lights,

9

and began exiting his vehicle as soon as he stopped. Connell testified that those actions seemed unusual to him. Connell also testified that, when Chambers moved his hand out of view and toward his side, it "raise[d] a large red flag" in the minds of the responding officers. According to Connell, in such instances, officers are concerned that "the person driving the vehicle [may be] attempting to arm himself," "formulating a plan to attack the police once they come to a stop," or possibly destroying evidence. Connell went on to testify that he ordered Chambers to get back into his vehicle and that he and the other officer subsequently placed Chambers in handcuffs out of concern for their safety.

Connell's concerns for officer safety justified his actions and did not elevate the investigative detention into a formal arrest. *See Vactor v. State*, 181 S.W.3d 461, 466 (Tex. App.— Texarkana 2005, pet. ref'd) ("When reasonably necessary *given the circumstances of the investigative detention*, an officer may place a suspect in handcuffs for purposes of protecting and ensuring the officer's safety . . . ."). Based on the evidence presented at the suppression hearing, we affirm the trial court's finding that the police conducted an investigative detention when Chambers finally stopped, notwithstanding their display of force and use of handcuffs. Because the illegal drugs and stolen weapons were discovered almost immediately after the detention, we also agree with the trial court's finding that the officers had probable cause to arrest Chambers.[8]

We overrule the second point of error.

---

[8]Although not developed in the suppression hearing, in his testimony before the jury, Connell testified that it was discovered, during the roadside investigation, that Chambers in fact had an active warrant for failure to appear at a child support hearing.

## IV.    An Article 38.23 Jury Instruction Was Not Warranted

Chambers next urges that the trial court erred in not including an Article 38.23 instruction in the court's jury charge. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2018).  We disagree.

The Court of Criminal Appeals has held that, if a defendant raises a fact issue about whether a traffic stop violated the Constitution or laws of either the United States or Texas, the trial court should instruct the jury to disregard any evidence it finds was obtained in violation of the Constitution or laws of the United States or Texas.  *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012) (citing TEX. CODE CRIM. PROC. ANN. art. 38.23(a)).  However, an Article 38.23(a) instruction is "mandatory only when there is a factual dispute regarding the legality of the search."  *Williams v. State*, 356 S.W.3d 508, 525 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Pickens v. State*, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005)); *see also Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007) (holding that "[t]here must be a genuine dispute about a material fact"); *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004) (holding that "an Article 38.23 instruction must be included in the jury charge only if there is a factual dispute about how the evidence was obtained").  Thus, to be entitled to an instruction under Article 38.23(a), the following factors must be shown to exist:  "(1) The evidence heard by the jury must raise an issue of fact; (2) The evidence on that fact must be affirmatively contested; and (3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence."  *Williams*, 356 S.W.3d at 526.

Moreover, even where an officer is mistaken about a historical fact, an Article 38.23 instruction is not necessarily required.  *Robinson v. State*, 377 S.W.3d 712, 720 (Tex. Crim. App.

11

2012). Rather, "[a] police officer's reasonable mistake about the facts may yet legitimately justify his own conclusion that there is probable cause to arrest or reasonable suspicion to detain." *Id.* In such instances, "a mistake about the facts, *if* reasonable, will not vitiate an officer's actions in hindsight so long as his actions were lawful under the facts as he reasonably, albeit mistakenly, perceived them to be." *Id.* at 720–21. In such instances, an Article 38.23 instruction is not required unless "there is a dispute about whether a police officer was genuinely mistaken, or was not telling the truth, about a material historical fact upon which his assertion of probable cause or reasonable suspicion hinges." *Id.* at 721. Thus, even though Chambers' vehicle did have a required license plate, an Article 38.23 instruction was not required unless there is evidence creating "a genuine dispute" about whether Connell's mistake was unreasonable or that he was lying about his observation. *See Madden*, 242 S.W.3d at 510; *Robinson*, 377 S.W.3d at 720–21.

Connell testified that, from his vantage point, he could not see a license plate on the rear of Chambers' truck. As discussed above, the dash-cam recording from Connell's police vehicle featured a high degree of glare, and it is not possible to see the license plate that was eventually discovered on the left side of the bumper. However, two photographs depicting the rear of Chambers' vehicle were introduced into evidence. Both appear in black and white in the appellate record, and both appear to have been taken inside a fully lit garage or warehouse. One photo is taken from a distance of perhaps four to five feet. The other evidentiary photo is taken from a much closer vantage, just inches from the plate. While this evidence might arguably create a dispute about whether the license plate was or was not visible in a well-lit garage and from close distance, it does not create a factual dispute about whether it was visible at the time and under the

12

circumstances in which Connell made his decision to stop Chambers. Thus, there is no evidence demonstrating that Connell's conclusion that the vehicle did not have a license plate was unreasonable.

We next consider whether there is any evidence creating a disputed fact question whether Connell was untruthful in his testimony.[9] In order "[t]o raise a disputed fact issue warranting an Article 38.23(a) jury instruction, there must be some affirmative evidence that puts the existence of that fact into question." *Madden*, 242 S.W.3d at 513. In *Madden*, the trooper testified that he stopped Madden for speeding, having registered his speed at sixty-one mph on radar. In the officer's recording of the traffic stop, however, Madden was heard saying that he had his cruise control set at fifty-five mph. The Court of Criminal Appeals held that Madden's speed was a disputed fact that had to be submitted to the jury. *Id*. at 513–14. Nevertheless, in *Madden*, there was evidence disputing the facts existing at the time the trooper made his decision to initiate a traffic stop. In the present case, Chambers points to facts existing after Connell made his decision to initiate the traffic stop and under conditions different from those existing when Connell made that decision.

Essentially, Chambers argues that, because the vehicle did, in fact, have a license plate, and because that plate was visible in photos taken in a well-lit garage after Chambers had been arrested, a jury could infer that Connell was lying when he testified that he did not see the license plate at the time he decided to stop Chambers. Yet, Connell was consistent in his position that he

---

[9]It is conceivable that an officer's testimony might be reasonable but also untruthful. Thus, merely because the officer's testimony is reasonable does not automatically mean the officer's testimony was truthful.

did not see a license plate, and no other witness testified that the plate was visible at the time Connell made his decision to stop Chambers. Likewise, due to the glare, the license plate is not visible in the dash-cam recording taken at the time when Connell elected to stop Chambers. And, the photographs showing the paper license plate in a well-lit garage, after Chambers was arrested, do not reflect the circumstances existing at the time Connell stopped Chambers. Accordingly, Chambers' argument that Connell was being untruthful is mere speculation.[10] Thus, there is no evidence creating a genuine issue of fact that Connell was not truthful about the basis for his reasonable suspicion.[11]

Consequently, we find that the trial court did not err in refusing Chambers' request for an Article 38.23 instruction. We overrule the third point of error.

## V. Chambers' Sentence Did Not Violate the Eighth Amendment

Chambers complains, in his final point of error, that his twenty-year sentence is "grossly disproportionate to the offense committed in light of the specific facts of the case." In support of this argument, Chambers points to (1) evidence of his history as a law enforcement agent, (2) his lack of prior convictions or adjudications, (3) his compliance with officers at the scene, (4) the remorse he expressed to the jury, (5) his history of drug dependence and abuse, and (6) the fact

---

[10]Chambers' cross-examination of Connell did not and could not create a disputed fact issue. *See Madden*, 242 S.W.3d at 513–15.

[11]*See Foster*, 814 S.W.2d at 884 (holding that existence of paper license plate inside tinted rear window did not create fact question justifying Article 38.23 instruction because the fact "that appellant's vehicle did display a paper dealer's license plate [wa]s not in dispute, but neither [wa]s the fact that both officers did not initially see it displayed inside the vehicle's tinted rear window"); *see also Green v. State*, 866 S.W.2d 701, 703 (Tex. App.—Houston [1st Dist.] 1993, no pet.) (holding that partially visible temporary license plate provided reasonable suspicion for the officer to stop the vehicle).

that the 5.42 grams of methamphetamine involved was barely within the four to two-hundred gram range for the offense charged.  We find Chambers has failed to demonstrate that his sentence was grossly disproportionate to the evidence before the jury.  We will overrule this point of error.

The United States Constitution's ban on cruel and unusual punishment "requires that punishment be graduated and proportioned to the offense."  *State v. Simpson*, 488 S.W.3d 318, 322 (Tex. Crim. App. 2016) (citing U.S. CONST. amend. VIII).  However, this principle "does not require strict proportionality between the crime and the sentence."  *Id*. (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).  Rather, only those extreme sentences considered grossly disproportionate to the crime are forbidden.  *Id*. (citing *Ewing v. California*, 538 U.S. 11, 23 (2003) (plurality op.)).  A finding that a sentence is grossly disproportionate has only been made in exceedingly rare and extreme cases.  *Id.* at 322–23 (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)).  Generally, "punishment assessed within the statutory limits, including punishment enhanced pursuant to a habitual-offender statute, is not excessive, cruel, or unusual."  *Id*. at 323 (citing *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006)).

In determining whether a sentence for a term of years is grossly disproportionate to a particular crime, we consider "the severity of the sentence in light of the harm caused or threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses."  *Id*. (citing *Graham v. Florida*, 560 U.S. 48, 60 (2010)).  Only in those rare cases in which our initial comparison gives rise to an inference of gross disproportionality do we then "compare the defendant's sentence with the sentences received by other offenders in the same

15

jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id*. (citing *Graham*, 560 U.S. at 60); *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.).

### A. Punishment Evidence

Chambers argues that he had no prior convictions or adjudications. The record supports this claim. The record also showed Chambers' history as a law enforcement officer and civilian security contractor in Iraq. However, the State also produced evidence of increasing illicit drug use over the recent years as well as evidence that he abused his girlfriend and engaged in questionable weapons sales. The punishment evidence also established that the two loaded pistols found during the traffic stop were stolen and that Chambers was involved in the theft.

### 1. Evidence Regarding the Firearm Theft

Shortly before Chambers was stopped by Connell, Steven Shaw's home was broken into, and his firearms collection was stolen. Shaw was Chambers' former neighbor. Shaw and Chambers had traveled on occasional fishing trips together, and Shaw had loaned money to Chambers. Shaw testified that Chambers knew Shaw had a significant collection of firearms in his home.

On March 29, 2017, while Shaw was out of town, a houseguest discovered the home had been burglarized. Shaw determined that forty-four guns were stolen during the burglary. Shaw provided detailed records of his firearms to law enforcement. The guns in Chambers' truck bore serial numbers of two of the stolen pistols. There was also a receipt to Shaw in Chambers' truck.

16

At trial, Matt "Taz" Kubasta testified that the Shaw robbery was Chambers' idea. According to Kubasta, he, Chambers, and Chambers' girlfriend, Morgan Roach, went to Shaw's home together. According to Kubasta, Roach knocked on the front door to verify that no one was home. After verifying that the home was empty, Kubasta and Chambers broke in the back door and carried out the guns and other property.

Roach testified that she did not know Kubasta and Chambers intended to steal Shaw's guns. According to her, she stayed in the car while the two men broke into the home. Roach also testified that Shaw was a very good man who had been very kind to Chambers. After the burglary, Roach testified that Chambers said, "Well, [Shaw] didn't -- he didn't help me. I texted him and asked for money to pay my child support, and he didn't respond." Roach testified, "[I]t was, like, the first time Steve Shaw never replied [to Chambers' request for help], he went and robbed him."

Kubasta also testified that Chambers claimed he already had buyers for all of the guns they could take from Shaw's, but that he did not. Instead, the two men conducted gun shows and private meetings in order to sell the guns. Chambers' and Kubasta's telephone records were also introduced showing that the two men had been conducting internet searches to determine the values of specific guns, including some of the guns taken from Shaw's home.

### 2.    Evidence Regarding Questionable Firearm Sales

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Shawn Kang testified that he received a report about a questionable firearms sale involving Chambers in

17

December 2011.[12] During his investigation, Kang observed Chambers in a parking lot with several firearms and SWAT gear displayed. A person arrived to see the wares, and that man told Kang he assumed Chambers had the proper licensure to sell guns.

When Kang identified himself, Chambers displayed his constable's badge. Kang told Chambers to stop selling weapons without proper authority. Kang asked Chambers how he, as a law enforcement officer, could sell firearms to individuals without the requisite background checks. Chambers answered that he had "been doing it for 20 years," and that he knew "just by looking at them" if potential purchasers would pass the background check.[13]

Chambers complied with Kang's request for the identities of persons to whom Chambers had sold firearms. But when Kang went to interview those people, or Chambers' girlfriend Roach, he found each had already been contacted by Chambers and advised that the ATF would be contacting them. One of these purchasers, Gary Leasman, testified that Chambers called him and told him not to tell the ATF he had bought two guns from Chambers.

### 3.     Evidence Regarding Drug Use and Domestic Abuse

Roach testified she met Chambers when she was an eighteen-year-old escort. She testified that Chambers was thirty-seven-years old and married at that time. Roach testified that they began

---

[12]Derek Deike testified that he bought a semi-automatic rifle from Chambers. Deike said that he showed it to friends who were more experienced and knowledgeable about semi-automatic rifles because he was not familiar with this type of weapon. This included a friend who had served multiple tours in the war in Iraq. They all urged him to never fire the weapon, which they all said was extremely dangerous. Deike contacted Chambers for a refund. Chambers ceased contact with Deike, who next informed the ATF about the sale and suspect rifle. Kang examined Deike's rifle and testified Chambers essentially built the gun from parts.

[13]Kang was also concerned by Chambers' "hollow cheeks, dry mouth," and being "very hyper," indicating he possibly was "under the influence of drugs."

18

seeing each other and that Chambers eventually moved Roach into his home the day after his wife moved out. According to Roach, she and Chambers abused prescription drugs and methamphetamine together, and over time, the amount they used escalated. Roach testified that, as the drug abuse became chronic, Chambers became paranoid she was seeing other men and routinely beat her.

### 4. Chambers' Law Enforcement History

Chambers testified that he was a former law enforcement officer. He worked approximately fourteen years for the Williamson County Sheriff's Department, starting as a jailer and rising to "master peace officer" and investigator. Chambers testified that he had received multiple commendations. His experience also included significant training and expertise with firearms as an armorer.

One of the State's witnesses testified that he and Chambers became detectives at the same time. After leaving the sheriff's department, Chambers served as a private security contractor in Iraq for two-year-long rotations. This led to a post-traumatic stress disorder diagnosis. In 2010, Chambers returned to Williamson County as a constable.[14] During this time, Chambers was prescribed prescription pain and anxiety medications and then began abusing them. After working at the constable's office for approximately two years, Chambers performed odd jobs for a mechanic (where, according to Chambers and Roach, illegal drug use was rampant), and he worked

---

[14]Roach testified that, during his time at the constable's office, Chambers went to gun shows to purchase weapons. Using his skills and access as the gunsmith or armorer at the sheriff's office, Chambers would convert semi-automatic weapons to fully automatic and sell those guns.

as a bounty hunter. Chambers' abuse of prescription narcotics and methamphetamine accelerated, culminating in the Shaw burglary and then the traffic stop leading to the instant conviction.

**B.     Analysis**

The punishment evidence at trial did not create an inference of gross disproportionality in Chambers' sentence. It is true that Chambers had no prior adjudications or convictions, that he spent a large part of his life as a law enforcement officer, and that he had served as a security contractor in Iraq. Yet, he had clearly spent the last several years before his conviction abusing drugs and engaging in escalating criminal activity. His subsequent conduct—such as abusing his girlfriend, abusing prescription drugs and methamphetamine, engaging in illegal firearm sales, and burglarizing an old friend's home—was completely at odds with his history as a law enforcement officer.

In the present case, although twenty years is the maximum allowed by statute for Chambers' second-degree conviction, Chambers was arrested with more than five grams of methamphetamine and two loaded pistols easily within his reach. Methamphetamine bears a significant threat of harm to the community. Methamphetamine held along with loaded pistols amplifies that threat.

Likewise, there is no question about Chambers' culpability. Despite his denial of involvement in the burglary and theft of more than forty firearms, there was substantial evidence that Chambers' involvement was much more than he told the jury. That jury was free to weigh Chambers' credibility against the credibility of his two co-defendants in the burglary. Consequently, Chambers' sentence did not constitute a grossly disproportionate sentence.

## VI.    Conclusion

For all of the foregoing reasons, we affirm the trial court's judgment and sentence.


Ralph K. Burgess
Justice

Date Submitted:    February 5, 2019
Date Decided:    March 29, 2019

Do Not Publish